[No. B046201. Second Dist., Div. Seven. July 18, 1991.]

WEST HOLLYWOOD CONCERNED CITIZENS et al., Plaintiffs and Appellants, v.
CITY OF WEST HOLLYWOOD et al., Defendants and Respondents.

488

COUNSEL

Craig Mordoh for Plaintiffs and Appellants.

Michael Jenkins, City Attorney, Richards, Watson & Gershon, Carol W. Lynch and Christi Hogin for Defendants and Respondents.

## Opinion

**JOHNSON, J.**—In this case we hold a $48-per-year registration fee imposed on rent controlled units does not necessarily deprive landlords of their constitutionally guaranteed "just and reasonable rate of return." Accordingly, we affirm the trial court's rejection of a facial constitutional challenge to that fee.

### Statement of Facts and Proceedings Below

In September 1985, the newly created City of West Hollywood (City) enacted a comprehensive rent control program. This program has three key elements.

(1) The program imposed an initial maximum level for each unit which is called the "base rent." The City set the "base rent" as the amount of rent actually charged under free market conditions on April 30, 1984. (West Hollywood Mun. Code, §§ 6402(A),[1] 6408(A)(2).)

(2) The program allows automatic upward adjustments to the "base rent" each year. The formula fixes these adjustments at 75 percent of the annual rise in the consumer price index (CPI). Landlords are free to raise their annual rents by this percentage without making any application to the City's rent control authorities. (§ 6409.)

(3) The program permits individual landlords to apply to the City's rent control authorities for additional rent increases beyond those permitted by the "base rent" and automatic annual adjustments. To succeed with such an application, however, a landlord generally has to prove the present allowed maximum rent for a particular unit or units does not provide a "just and reasonable" rate of return under the City's "maintenance of net operating income" formula. (§ 6400 et seq.)

In order to operate this rent control program, the City charges landlords an annual registration fee for each rental unit. (West Hollywood Mun. Code, § 6407.) As of 1985, the City set this registration fee at $48 per unit, but allowed landlords to charge the entire fee "to the tenant of each affected unit in the form of rent surcharge pro rated over a twelve (12) month period." (§ 6407(c).)

---

[1] Unless otherwise indicated, all statutory references are to the West Hollywood Municipal Code.

In 1989, the City decided to double this registration fee to $96 per unit and divide the higher fee between landlords and tenants. The first step was accomplished on July 17, 1989, when the city council passed resolution 560 raising the annual fee itself to $96 per unit. The council attempted to split this burden by including a provision in resolution 560 which took away the landlords' discretion to pass through more than $48 per year of the registration fee to their tenants.

Belatedly realizing resolution 560 conflicted with section 6407(c) of the rent control law, on August 7, 1989, the city council enacted a nonurgency ordinance. This ordinance amended section 6407(c) to specifically authorize the city council, by resolution, to allocate the burden of the registration fee between landlords and tenants. The council then passed resolution 569 which, like 560, provided landlords could only pass through $48 of the $96 fee.

In late August, a landlord's association and several individual landlords (landlords) filed suit challenging the imposition of this new $48 charge. The complaint alleged this increased cost deprived them of their constitutionally guaranteed "just and reasonable return" on their rental properties. It also alleged fatal procedural irregularities in the enactment of the ordinance and resolution purporting to take away their discretion to pass through the entire registration fee to their tenants.

On August 30, 1989, the day before the higher fee was to go into effect and be imposed on landlords, the trial court granted a temporary restraining order. The city council met on September 5, 1989, and enacted an urgency ordinance, Ordinance 636U. This emergency measure essentially reenacted the August 7 ordinance once again amending section 6407(c) to permit the council, by resolution, to determine how much of the registration fee landlords would be allowed to pass along to tenants. At that same session, the city council also passed a resolution to implement this authority by denying landlords the discretion to pass through more than $48 per year of the $96 registration fee.

On September 19, 1989, the trial court held a hearing on the landlords' plea for a preliminary injunction. The court denied the preliminary injunction and dissolved the temporary restraining order (TRO). The landlords timely appealed.

### Discussion

This appeal raises two issues. We first consider whether there was a lawfully enacted and enforceable provision denying landlords the discretion

to pass through $48 of the new $96 registration fee. Then we consider if the imposition of this $48 portion of the fee on landlords deprives them of their constitutional guarantee of a "just and reasonable" return on their rental properties.

I. *The City's Pre-September 1 Enactments Denying Landlords Discretion to Pass Through a Portion of the Increased Registration Fee Were Procedurally Defective, but the September 5 Urgency Ordinance Was Valid and It Was Not Impermissibly Retroactive in Operation.*

Landlords contend an urgency ordinance the City enacted on September 5, 1989, represented an impermissible retroactive change effecting the raise in fees which had become effective on September 1, 1989. According to this argument this belated urgency ordinance became necessary because of technical procedural defects in earlier resolutions and code amendments the city council had passed prior to September 1. While we are persuaded there is a likelihood the landlords would succeed in establishing several of the pre-September 1, 1989, council actions were fatally defective, we conclude the September 5 urgency ordinance cured these defects and is not an impermissible retroactive change. To understand why, we begin with the 1985 ordinance which first authorized the fee and permitted landlords to pass the fee along to their tenants.

Section 6407(c) originally read in pertinent part:

"[T]he landlord shall pay a registration fee to the City in an amount to be determined by resolution of . . . the City Council, for each rental unit under his or her ownership to reimburse the City for administrative costs associated with administration of this Chapter. The *full* amount of this registration fee *may be charged* to the tenant of each affected unit *in the form of rent surcharge prorated* over a twelve (12) month period. No fee may be passed through if it has not actually been paid by the owner. . . .The registration fee may be waived pursuant to regulation." (§ 6407(c), italics added.)

This code section clearly authorized the city council to set the *amount* of the registration fee by means of a simple resolution. So the landlords do not challenge the council's legal authority to pass resolution 560 on July 17, 1989, doubling the fee from $48 per year to $96 per year. This raise was to become effective with the registration fees due on September 1, 1989. Nor do the landlords question the passage of this resolution on procedural grounds.

It is the council's attempts to deny them the discretion to "pass through" this fee increase which the landlords claim were procedurally defective. The

first such attempt was contained in resolution 560 itself which provided the $48 increase could not be passed along to tenants.

In its brief, the City argues the resolution was consistent with the language of the original version of section 6407(c). It points to the permissive nature of the language in that ordinance saying the "full amount of this registration fee may be charged to the tenant." The City argues this "may" applies to the City as well as the landlord and resolution 560 is merely an exercise of the City's permissive discretion under section 6407(c) to require landlords themselves to bear some proportion of the registration fee.

We are not persuaded by the City's construction of section 6407(c) as it existed in July 1989. Read in context, it is indisputable "may" refers to discretion the City conferred on landlords not on discretion it retained for itself. The language of section 6407(c) allowed but did not require that landlords pass on these registration fees to their tenants. There is no room for a construction that the City retained discretion *by resolution* rather than amendment of section 6407(c) to withdraw that full allocation of discretion which it made to the landlords operating within the boundaries of West Hollywood.

Accordingly, we find resolution 560 was effective to raise the registration fees from $48 per year to $96 per year. It was not effective to deprive landlords of their discretion to pass through the *entire* fee (including the additional $48 increment) to their tenants.

The City's second attempt to require landlords to bear half of the higher registration fee tripped over another procedural obstacle. This attempt came in the form of an ordinance enacted August 7, 1989, amending section 6407(c) to authorize the council to do by resolution what it had tried to do earlier in resolution 560—to deny landlords the discretion to pass along registration fees to their tenants. Immediately thereafter, the council implemented this newly authorized power by passing resolution 569. This resolution, like resolution 560, provided the landlords could not pass on to their tenants the new $48-per-year increment in registration fees which was to become effective with the fees due September 1, 1989.

This ordinance amending section 6407(c) was fatally defective, however. It was introduced and passed at the same session of the city council yet did not include any urgency language. This violated the terms of Government Code section 36934 which provides that nonurgency ordinances may not be enacted on the day they are first introduced. "Ordinances shall not be passed within five days of their introduction. . . . However, an urgency

ordinance may be passed immediately upon introduction. . . ." (Gov. Code, § 36934.) As would be expected, an ordinance enacted in violation of this Government Code section is void. (*County of Los Angeles* v. *City Council* (1962) 202 Cal.App.2d 20 [20 Cal.Rptr. 363].)

We also observe Government Code section 36937 provides that nonurgency ordinances "take effect 30 days after their final passage." Accordingly, the ordinance amending section 6307(c) was not properly enacted and, in any event, was not yet effective when resolution 569 was passed purportedly under the authority of this new ordinance. The original language of section 6307(c) remained intact and the city council lacked legal authority to take away the landlords' discretion to pass through the fee increment to their tenants. As a result, we agree the city council's pre-September 1, 1989, attempts to eliminate the landlord's discretion to pass along the fee increment were invalid.

On September 5, 1989, however, the city council finally got it right. In response to the landlord's lawsuit and the temporary restraining order which ensued, the council enacted an *urgency* ordinance, 236U. This ordinance amended section 6407(c) to expressly authorize the council by resolution to "determine . . . the amount of this registration fee, if any, which may be charged to the tenant." At that same session the council passed a resolution nearly identical to resolutions 560 and 569 which implemented this authority by depriving landlords of their discretion to pass through the $48 increment to their tenants.

■ The landlords do not dispute this urgency ordinance was properly enacted and effective immediately. But they do contend it was enacted five days too late because allegedly it impermissibly effects a retroactive change as to fees due on September 1. With this contention we disagree.

We first recognize this did not represent a retroactive increase in the amount of the registration fee. The raise from $48 to $96 a year was authorized on July 17, 1989, through resolution 560. This element of resolution 560, in turn, was fully consistent with code section 6407(c) as it existed on that date. Even at that time section 6407(c) ordered landlords to pay registration fees "in an amount to be determined by the resolution of the . . . City Council."

The only thing urgency Ordinance 236U did that could be characterized in any way as being "retroactive" was to legitimatize the earlier resolution denying landlords their *discretion* to pass along the entire registration fee to their tenants. Even if this were construed as a retroactive increase in a tax

imposed on the landlords it would not be constitutionally impermissible. The courts have consistently upheld against constitutional challenges new taxes and tax increases which operated retrospectively. (*Milliken* v. *United States* (1931) 283 U.S. 15 [75 L.Ed. 809, 51 S.Ct. 324] [retroactively increased tax rates on gifts in contemplation of death]; *United States* v. *Hudson* (1937) 299 U.S. 498 [81 L.Ed.370, 57 S.Ct. 309] [upheld new tax including transfers which had occurred 35 days before enactment of the tax]; *Sunset Nut Shelling Co.* v. *Johnson* (1942) 49 Cal.App.2d 354 [121 P.2d 849] [amendment to the Franchise Tax Act retroactively raising rate upheld even for those who had paid tax at earlier rate]; 9 Witkin Summary of Cal. Law (9th ed. 1989) Taxation, § 27, and cases cited therein.)

In any event, this is probably more accurately characterized not as a new tax or a tax hike but merely as an enactment affecting the landlords' discretion to pass along an increased tax to their tenants. As to the removal of this discretion, the urgency ordinance on September 5, 1989, had no retroactive application.

The original ordinance code section 6407(c) gave landlords the discretion to pass along all or part of this registration fee *in 12 monthly installments*. Accordingly, as to rent due on or after September 6, 1989, the September 5 enactment disallowing these "registration fee surcharges" was clearly not retroactive. As to these post-September 5 installments the urgency ordinance and implementing resolution obviously spoke only prospectively.

But what of those landlords with rent due on September 1-5, 1989, and their discretion to pass through as much as $4 of the $48 increase in registration fees? First, we note that the landlords' complaint does not allege that any landlord had a rental installment due from a tenant on any of those days. Nonetheless, we will assume that at least some of the landlords did have rental installments on those dates and, moreover, would have used their discretion to pass through the registration fee increment through a monthly surcharge of up to $4.

Accepting these assumptions, however, the landlords' own litigation in this matter meant they had nothing to pass through on those dates. As will be recalled, on August 30, 1989, the landlords succeeded in persuading the trial court to issue a temporary restraining order enjoining the city from collecting the $48 increase in its registration fee. Under the terms of the original section 6407(c) landlords had the discretion to pass through all or part of the registration fee only if that fee had "*actually been paid* by the owner." The TRO prohibited the City from collecting the $48 increment and thus no landlord actually paid the increment while the TRO was in effect. Since the

increment had not "actually been paid" by the landlords they could not lawfully increase their "registration fee surcharge" to rent installments due from tenants during this period.

The TRO was not lifted until September 19, 1990. By that time the September 5 ordinance was in effect and prohibited landlords from passing through to their tenants any portion of the $48 annual increment fee. In effect the landlords' own litigation had taken away their discretion to pass through any "registration fee surcharges" which might have come due as part of a monthly rental payment to be made from September 1-5, 1989. By the time they had any obligation to pay the $48 per year increment and thus be in a position to comply with the original section 6407(c) requirement the fee actually had been paid and their discretion to pass through that increment had been eliminated by an urgency ordinance enacted nearly two weeks earlier on September 5. Accordingly, even as to that very first installment, the September 5 urgency ordinance and implementing resolution did not, as a practical matter, operate retroactively but only prospectively.

To sum up, we conclude the City's September 5 enactments did not violate the ban on retroactive legislation. We reach this conclusion for two independent and sufficient reasons. Construed as a tax increase imposed retroactively, the September 5 urgency ordinance and implementing resolution were not impermissibly retroactive under the Constitution. Alternatively, construed as something less than a tax increase but merely an elimination of a discretionary power, the September 5 ordinance and resolution were prospective not retroactive in their application. Because of their own litigation, by the time the old law would have authorized landlords to pass through the increment in registration fees the new law was in effect and took away that discretionary power.[2]

---

[2]The landlords also argue in their briefs that by its terms the original section 6407(c) does not authorize annual registration fees of any kind. According to this argument, the ordinance only imposed a one-time registration fee when landlords initially registered in 1985. This argument is raised for the first time on appeal and could be rejected for that reason alone. However, we also conclude it lacks merit and reject it on that ground, too.

In their appellants' reply brief the landlords complain the City did not respond to this argument. Perhaps this omission from respondent's brief is explained by the fact the landlords' argument is without merit and ignores clear language in the rent control law. The original section 6407, in fact, did authorize the City to require annual registration of rental units and imposed fees upon such registrations. The salient portion of the original section 6407(a) reads: "[T]he Commission may in its discretion require *annual registration* of all units. . . ." (Italics added.) The original section 6407(c), in turn, begins: "*Upon registration* the landlord shall pay a registration fee to the City. . . ." (Italics added.) Nothing in the original version of section 6407 suggests the registration fee was to be paid only on the occasion of the initial registration of a rental unit. By its terms it applies to all "registrations" including annual registrations the City requires pursuant to section 6407(a).

II. *The $48 Fee Only Represents a Minor Diminution in the Landlords' Long-run Rate of Return and in a Facial Challenge It Is Not Reasonably Probable the Landlords Will Be Able to Establish It Deprives Them of Their Constitutional Guarantee of a "Just and Reasonable" Rate of Return.*

The California Supreme Court upheld the constitutionality of rent control laws in 1976. (*Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129 [130 Cal.Rptr. 465, 550 P.2d 1001].) ■ At the same time, however, it ruled the Constitution requires that rents be controlled at levels which allow landlords at least a "just and reasonable [rate of] return." (*Id.* at p. 165.) In order to achieve this goal in practice the Supreme Court held a rent control system must fix the initial maximum "base rents" at levels which provide that constitutional minimum of a "just and reasonable [rate of] return." (*Ibid.*) Furthermore, the system must supply an "adjustment mechanism" to maintain the constitutional minimum return as the landlords' costs rise as a result of long-run inflation. Otherwise over time "many or most rent ceilings would be or become confiscatory." (*Id.* at p. 169.) This "adjustment mechanism," in turn, must not be unduly slow or cumbersome in operation. (*Ibid.*)

■ The landlords contend the new $48-per-year increment in registration fees is "confiscatory." Their argument goes as follows. This $4-per-month fee increment, as a practical matter, represents a reduction in the annual upward inflation adjustment in the maximum rent they are allowed to charge under the West Hollywood Rent Control Act. Deprived of this full annual inflation adjustment for 1989 these landlords are denied their constitutional right to a "just and reasonable return" on their properties.

We first observe this is a *facial challenge* to the constitutionality of this $48 increment in registration fees. None of these landlords applied for or were denied additional rent increases upon proving—or attempting to prove—that if compelled to absorb this additional $48 per year registration fee their return would diminish to the point it was no longer "just and reasonable." Accordingly, there is no evidence in the record demonstrating what any of these landlords' rates of return may have been before this $4-per-month increment in fees. Nor is there evidence whether any of them had a rate of return so close to that which would be deemed minimally constitutional as to be forced over the edge by such a modest increase in costs.

In the absence of such evidence, the landlords' position appears to rest on two propositions. First, they assert or assume the "base rents" the City fixed

at the inception of its rent control program in 1985 represented the minimum rent levels permissible under the constitutional requirement of a "just and reasonable return." Secondly, they further assert or assume the formula for annual inflationary adjustments allows the minimum level of rent increases which is essential to maintain the minimally permissible rate of return on their properties. If, and only if, both of these propositions are valid can the landlords demonstrate a reasonable probability they will prevail with this lawsuit and thus establish their entitlement to a preliminary injunction. Upon closer scrutiny, neither of these propositions stands up.

The "base rent" set in 1985 did not necessarily represent the minimum rent level necessary to fulfill the constitutional guarantee of a "just and reasonable" rate of return. It is true the West Hollywood rent control ordinance states this base rate gives landlords a "just and reasonable" return. But this does not mean these base rents represent the minimum which would be constitutionally permissible. "There is a range of rents which can be charged, all of which could be characterized as allowing a 'just and reasonable' return . . . ." (*San Marcos Mobile Home Park Owners' Assn.* v. *City of San Marcos* (1987) 192 Cal.App.3d 1492, 1502 [238 Cal.Rptr. 290], review den. Sept. 23, 1987.)

The City of West Hollywood, in fact, set the initial "base rents" at levels established by the market a few months before the rent control act became effective. In many, if not most instances, the market may very well have allowed rentals substantially in excess of those required to satisfy the constitutional mandate of a "just and reasonable" return.[3] There is nothing in this record demonstrating the landlords will be able to adduce persuasive evidence to the contrary at the trial of this action.

This court cannot base its decisions on suppositions and speculations. We cannot say as a matter of law that a base rent set by the market even at a somewhat earlier date represents the *minimal* level which is *constitutionally* permissible. And if that proposition falls so does the rest of the landlords' constitutional argument. For, as the New Jersey Supreme Court pointed out: "The return which landlords were obtaining at the base rent levels may well have been so far above the just and reasonable mark that the present diminished rate of return may still be more than just and reasonable even if

---

[3]This does not mean there may not be a *statutory* right under the West Hollywood Municipal Code for landlords to set their initial "base rent" at what the market fixed as appropriate on the critical date. (See *Vega* v. *City of West Hollywood* (1990) 223 Cal.App.3d 1342 [273 Cal.Rptr. 243] [permitting individual landlord who had maintained rates at artificially low level—about one-third of comparable units—during the critical period to readjust "base rent" to match the level charged for comparable units during that period].)

current cost increases are outpacing permissible rent increases." (*Hutton Park Gardens* v. *Town Council* (1975) 68 N.J. 543 [350 A.2d 1, 16].)

Even were we to assume the initial base rates represented the constitutional minimums for all or most West Hollywood landlords, this does not mean a $48-a-year cost increase as a matter of law necessarily deprives them of the inflation adjustments needed to maintain that minimum return. An inflation adjustment formula prescribed in the City's rent control laws does not necessarily produce only those annual rent increments which are necessary to maintain a "just and reasonable" return. As was true of the "base rent," it may well be these annual increments are in excess of what would be needed to keep rent levels at the constitutional minimum. Thus, over the years, what started as a constitutionally minimum base rent may evolve into a schedule of maximum rates which yields returns substantially above the just and reasonable mark the Constitution requires.

Once again, there is a failure of proof. The West Hollywood rent control law authorizes annual rent increases at 75 percent of the annual increase in the consumer price index. The landlords do not offer evidence or the prospect of evidence demonstrating this formula is calculated to produce only the bare minimum annual rent increases necessary to maintain a "just and reasonable" rate of return on their properties. Many costs of owning a rental property are fixed, often relating back to a much earlier date. Other expenses may grow at a rate below the average of the CPI. (Obviously other of the landlords' expenses may grow at a higher rate than the CPI.) But this court cannot hold as a matter of law the increase of 75 percent of the CPI each year represents the bare minimum required to satisfy the constitutional mandate. Accordingly, we cannot say that diminishing this annual *increase* by $48 in one year will necessarily deprive all or most landlords of their constitutionally guaranteed "just and reasonable" return.

The landlords argue this $48-per-unit fee increase diminishes their annual upward inflation adjustment for 1989 by one-fifth to one-third, depending upon the rent charged for various units. The West Hollywood inflation adjustment formula yielded a 3.75 percent increase in maximum rents for 1989. Accordingly, for an apartment renting at $300 per month, the $48 fee increment would reduce the net allowable rent *increase* by 35 percent; for an apartment renting at $500 it would reduce the net allowable rent *increase* b 20 percent; and for an apartment renting at $1,000, by 11 percent. The fee likewise would represent 1.3 percent of the total rent charged for a $300 a month apartment, 8/10ths of a percent for a $500 a month apartment, and 4/10ths of a percent of a $1,000-per-month apartment.

It does not follow automatically that diminishments of this scale in the allowable annual net rent *increase* for a single year will necessarily put most or all landlords at total rent levels which deprive them of a "just and reasonable" rate of return. Indeed on the basis of the record before this court we cannot say as a matter of law it would be constitutionally impermissible for the City to have denied West Hollywood landlords *any* inflation adjustment whatsoever in maximum rents *for a single year*. The Constitution does not require annual rent increases each and every year. It only requires that rent control agencies "not *indefinitely freeze* . . . profits." (*Fisher* v. *City of Berkeley* (1984) 37 Cal.3d 644, 683 [209 Cal.Rptr. 682, 693 P.2d 261], first italicized word, italics added.)

Moreover, we observe that while the $48-per-unit fee increase may appear fairly substantial when compared to a single year's inflation adjustment, it is more properly "amortized" over a longer span of years. That is, the $48 annual charge which may represent 20 percent of the 1989 inflation adjustment, 5 years later may well only represent 3 or 4 percent of the aggregate inflation adjustments allowed between 1989 and 1994. This comparison places this registration increase in the proper perspective. It reveals the minimal impact a $48-per-year (that is, $4 per month) added expense will mean for the adequacy of the landlords' long-run returns on their properties.

In the instant case, we are considering only a $48 diminishment in the average annual rate of return West Hollywood landlords would receive if this fee hike had not been imposed. For that slight a "diminishment" to deprive an individual landlord of a constitutionally mandated "just and reasonable" *return would require the landlord to have entered the year 1989 charging* rents which were at the precise constitutional minimum. There is nothing in the record suggesting this was true for all or most landlords in West Hollywood.

For those landlords who legitimately face this crisis the City provides a mechanism to provide relief. They can apply for individual rent increases to cover this $48 increment in expenses and demonstrate it forced them below the constitutional minimum of a "just and reasonable" rate of return. Alternatively, upon this showing, the city could waive all or part of the fee. (§ 6407(c).) We conclude it is not "reasonably probable" the landlords will be able to establish at trial that this mechanism will not be constitutionally adequate to take care of the anticipated numbers of property owners whose rates of return are so close to the constitutional minimum as to require relief because of a $48 increase in their costs.

### III. *The Trial Court Did Not Abuse Its Discretion in Denying the Preliminary Injunction.*

Trial courts consider two interrelated questions in deciding whether to issue a preliminary injunction: "1) are the plaintiffs likely to suffer greater injury from a denial of the injunction than the defendants are likely to suffer from its grant; and 2) is there a reasonable probability that the plaintiffs will prevail on the merits. [Citations omitted.] ' "[By] balancing the respective equities of the parties, [the court] concludes that, pending a trial on the merits, the defendant should or that he should not be restrained from exercising the right claimed by him." ' [Citations omitted.]" (*Robbins* v. *Superior Court* (1985) 38 Cal.3d 199, 206 [211 Cal.Rptr. 398, 695 P.2d 695].)

The grant or refusal of a preliminary injunction is, generally speaking, within the discretion of the trial court and its order may be reversed on appeal only if abuse of discretion is shown. (*Gosney* v. *State of California*) (1970) 10 Cal.App.3d 921, 924 [89 Cal.Rptr. 390].) "Discretion is abused in the legal sense 'whenever it may be fairly said that in its exercise the court . . . exceeded the bounds of reason or contravened the uncontradicted evidence.' [Citations omitted.]" (*Continental Baking Co.* v. *Katz* (1968) 68 Cal.2d 512, 527 [67 Cal.Rptr. 761, 439 P.2d 889].)

Since we conclude the landlords have not established a "reasonable probability" they will prevail on the merits at trial, we have no reason to balance the hardships between the landlords and the City. Accordingly, we affirm the trial court's denial of the preliminary injunction in this case.

#### DISPOSITION

The judgment denying the injunction is affirmed. Appellants to pay respondents' costs on appeal.

Lillie, P. J., concurred.

**WOODS (Fred), J.**—I concur in judgment only.